DOUGLAS *vs.* MERCELES and others.

1. The market value of stock is the actual price at which it is commonly sold.   That price may be fixed by sales of the stock in market at or about a given time.   If no sales can be shown on the precise day, recourse may

Douglas *v.* Merceles.

be had to sales before or after the day, and for that inquiry, a reasonable range in point of time is allowable.

2. Under a reference to ascertain the market price of a certain stock on a given day, the intrinsic value of the stock should not enter into the estimate, unless there has been no market price within a reasonable period, either before or after that day.

3. It is not material, in ascertaining such value, to inquire why the stock appeared in the market, when it was not thrown on the market in large quantities, and there is no reason to doubt that the seller obtained the best price he could for it.

On exceptions to master's report.

*Mr. S. Tuttle* and *Mr. Griggs,* for exceptants.

*Mr. A. B. Woodruff,* for complainant.

THE CHANCELLOR.

By an order made in this cause, on the 31st of March, 1873, it was referred to a master, to ascertain what the market value was per share, of the stock of the Riverside Land Improvement Company, on the 1st day of November, 1867, and also the number of shares of stock of that company, which, at the par value, $50 per share, would be equal to the one twenty-fifth part of $22,500 and interest thereon, from September 28th, 1866, to November 1st, 1867, and what the value of such shares would have been at that market value, so ascertained, on the last named day, and the amount of such market value of those shares, together with the interest thereon, up to the day on which the master should make his report. The master having reported, exception was filed to so much of his report as relates to the market value of the stock. He reports that that value was, on the 1st of November, 1867, $211.30 per share, and gives as his reasons for this conclusion, that the evidence shows that, on the day last mentioned, the stock was not in the market; that the company then owned three thousand one hundred and eighty lots of land; that each share of stock represented two and sixty-seven one hundred and twenty-fifths lots; that each acre of land

then owned by the company, contained twelve lots, and was worth $1000, at an average valuation, and that each lot was therefore worth $83.33.

Finding that the stock was not in the market on the day as of which the market value was to be fixed, he has found and reported what he considers to have been its intrinsic value. The market value and the intrinsic value are, by no means, necessarily the same; the terms are not convertible. The intrinsic value of a stock is not only not an infallible guide to its price in the market, but is, in fact, no guide at all. A stock intrinsically worthless, may bring a good price, while, on the other hand, one of great intrinsic value, may be greatly depreciated. If, under such a reference as that under consideration, the master should find no guide to which he could reasonably commit his conclusions—if he should find no market price within a reasonable period, either before or after the day to which his inquiries are to be directed, the intrinsic value may then enter into his estimate. But, the order in this case called for his report as to the market value, a term deliberately employed as being exactly expressive of the meaning of the court. And if a marketable value could be established, the master was bound to find and report it. The late Chancellor found no fraud in the conduct of the owners of the four and a-half shares of the original association. His language is (*Douglas* v. *Merceles*, 8 *C. E. Green* 335 :) "The bait of the profits was held out by the others, but Douglas did not believe in any profits; he had lost confidence in the speculation, and, like a prudent man, was not willing to make himself liable for more than he was already liable for. He rightly apprehended what the others did not see—that, if the scheme was a failure, he would be liable for losses in proportion to his interest. I can see no fraud practised upon him by the others. He was, perhaps, over cautious—at all events, as it turned out, those that had faith in it were right. But he cannot protect himself by his over-cautiousness, and then ask for a share of the profits of his less prudent associates, who chose to run the risk, and who have made the profits. I

am of opinion that the complainant is not, by the agreement, entitled to any part of these four and a-half shares in the original association." He held, however, that those who took those shares, ought to have paid for them with their own funds; but, instead of that, they paid for them in the funds of the association, and therefore with money of which the complainant was entitled to one-twenty-fifth part, for which part they are bound to account to him in the stock of the company, at its "real market value" at the time of the conveyance, the 1st of November, 1867. The company dissolved on the 17th of July, 1872. Its dissolution had taken place, and its assets had been divided among its stockholders, when the opinion above quoted was delivered. The order contemplated, therefore, that payment was to be made in money, instead of stock. The intention of the court was, to require the owners of those shares to account to the complainant for the one twenty-fifth part of the moneys of the association, taken to pay for those four and a-half shares, with interest, as in the stock of the company at its current value in the market on the 1st day of November, 1867.

The market price of a commodity is the actual price at which it is commonly sold. That price may be fixed by sales in market at or about the time. If no sales can be shown on the precise day, recourse may be had to sales before or after the day, and for that inquiry, a reasonable range in point of time is allowable. *Dana* v. *Fiedler*, 12 *N. Y.* 40; *Beach* v. *Raritan and Del. Bay R. R. Co.*, 37 *N. Y.* 457. There had been no sales before this date. There were none at that time; but there were some after it. It appears that, from the 1st of November, 1867, until December, 1870, the value of the stock in the market did not materially fluctuate. There is, therefore, no injustice to the complainant in taking the market prices between those dates as a criterion. And in taking this range, he has the benefit of some, at least, of the improvements put upon the property, and advantages secured for it by the company, after November 1st, 1867. After that date, an encumbrance was removed

and improvements were made and induced by the company, at very considerable expense, which must have enhanced the value of the stock. The encumbrance was a lease, having eleven years to run, upon between sixty and seventy of the three hundred and fifty acres owned by the company, for the surrender of which the company paid $6000. The improvements appear to have been, the location, building, and completion of the New Jersey Midland Railway through the property, the location by the railway company on the land of the land company of a depot at a convenient place selected by the latter, the building and operating of the Paterson and Little Falls horse railway through the property to the centre of Paterson, and the building of a number of dwelling-houses and the grading of the streets. On the 18th of February, 1868, the first sale of the stock appears to have been made. Then, twenty shares were sold at $100 per share, and though there were two sales of forty shares each, on the 1st of November, 1868, and one on the 10th of that month, of thirty shares, and another on the same day of twenty shares, and a sale of twenty shares on the 10th of September, 1869, yet at none of these sales, nor at all up to December 28th, 1870, did the stock bring more than $100 per share; and on the last named day, forty or fifty shares were sold at $140. The sale made in February, 1868, followed, as it was, by other sales, made in that year and in the two years and ten months following, none of which were at a greater price, may properly be regarded as fixing the marketable value of the stock as not exceeding $100 per share on the 1st of November, 1867. These sales were in the aggregate of one hundred and seventy shares. The quantities sold at the various sales were moderate, and the sales took place in Paterson, where the company and its property were located and its operations conducted. I leave out of view the opinion expressed by Mr. Hobart, the person who purchased the stock sold in February, 1868, that the stock, on the 1st of November, 1867, would not have brought more than $75 a share, because it is merely an opinion. The question to be deter-

mined is, what could the complainant, if he had owned the stock and had been willing to sell it, have got for it in the market, on the last named day, from a person willing to buy? Or, what price would he have been compelled to pay for it then? It is not to be forgotten that the enterprise was a speculation. Had it proved a failure after the 1st of December, 1870, the complainant would, under the evidence, have been entitled, in this account, to have had the market value of the stock on the 1st of November, 1867, fixed at $100 per share. The fact that the stock increased in value in the market after the 1st of December, 1870, and the speculation proved a success, cannot fairly or legitimately affect the conclusion as to its market value on the 1st of November, 1867. It is urged, however, on the part of the complainant, that these sales form no criterion of the market value of the stock, because the vendors were under some necessity to part with their stock, and were therefore not in a condition to insist on a full price. This allegation is not supported by the evidence. Besides, it does not seem to be material, in ascertaining the market price of the stock, to enquire why the stock appeared in the market. It was not thrown on the market in large quantities. The sellers, it is to be presumed, obtained the best price they could for it. That the stock did not command a better price in the market than $100 a share, at the time when these sales were made, is not denied.

The master should, under the evidence, have found that that sum was the market value of the stock on the 1st of November, 1867. The exceptions, therefore, are sustained. The interest on the market value of the stock, from November 1st, 1867, to October 21st, 1873, the date of the master's report, is $809.66. The master, therefore, should have reported that the amount of the market value of the shares, with the interest thereon, was $2746.75.